## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LAMARK DEWAYNE ROWELL,
     Petitioner,

v.                                                                          Case No. 8:21-cv-2542-KKM-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,
     Respondent.
_____

### ORDER

     LaMark DeWayne Rowell, a Florida prisoner, timely[1] filed a pro se Petition

for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court

conviction for sexual battery on a physically helpless person. (Doc. 1.) Having

considered the petition, (*id*.), the response in opposition, (Doc. 15), and the reply,

(Doc. 21), the petition is denied. Because reasonable jurists would not disagree, a

certificate of appealability also is not warranted.

## I.    BACKGROUND

### A. Factual Background

     In the early morning hours of September 25, 2010, Rowell raped a heavily

intoxicated woman in an alley behind a nightclub. (Doc. 6-2, Ex. 1a, at 176–77, 437–

38.) Rowell was 34 years old and homeless. (*Id.* at 328, 351.) The victim had just

turned 20 and was living with her parents. (*Id.* at 165, 167.) That evening, she and

her twin sister rented a limousine to take "10 [or] 11" friends to the Full Moon

Saloon, a nightclub in the Ybor City neighborhood of Tampa, Florida. (*Id.* at 167–

68.) The group chose that venue because "there was an invitation saying that if

[they] said a password at the door[,] [they] would get in marked as 21 and up."

---

[1] The Court previously denied Respondent's motion to dismiss the petition as untimely. (Doc. 12.)

(*Id.* at 168.) During the limousine ride, the victim drank rum and vodka. (*Id.* at 170–71.) By the time the group arrived at the nightclub, she was "drunk." (*Id.* at 216.)

The victim gave the password at the door. (*Id.* at 173.) The bouncer let her in but refused to give her the wristband for patrons "21 and up." (*Id.*) She went to the dance floor and began to dance with her "friends." (*Id.* at 174.) Minutes later, her sister joined her. (*Id.* at 217.) The victim soon became "really pale," and "her eyes started rolling in the back of her head." (*Id.*) She vomited, fell "[f]ace down in her vomit," and passed out. (*Id.* at 175, 237.) Five or six bouncers picked her up and "carried [her] out to the back alley." (*Id.* at 175, 238.) They refused to allow her sister to enter the alley. (*Id.*)

The next thing the victim remembered was "a guy asking [her] to open [her] legs." (*Id.* at 176.) She said "no" and tried to "force [her legs] closed." (*Id.* at 177.) At that point, she passed out again. (*Id.* at 200.) When she regained consciousness, she was lying on her back in the alley, surrounded by police officers. (*Id.* at 177, 200.) The victim was covered in "dirt," with "ants crawling on her" and "vomit in her hair." (*Id.* at 223.) The police asked her "to go to the hospital"; she declined because she "just wanted to find [her] sister and go home." (*Id.* at 177–78.) The victim and her sister left the nightclub in the limousine. (*Id.* at 180.) Believing that they "were going to be in trouble" with their parents, the sisters slept in a car in a Walmart parking lot. (*Id.*)

After waking up around 9:00 a.m., the victim drove to a friend's house. (*Id.*) As she prepared to shower, she noticed that her shorts "were inside out and backwards" and her underwear was missing. (*Id.* at 181.) She showered, then told her friend's mother that she "thought [she had been] raped." (*Id.*) They contacted

law enforcement, and later that morning the victim gave an in-person interview to the Tampa Police Department. (*Id.* at 182.) The same day, the victim underwent a sexual-assault examination, which revealed "redness" consistent with "vaginal penetration by a penis." (*Id.* at 302.) As part of the examination, the nurse swabbed the victim's vagina for DNA evidence. (*Id.* at 308.)

The vaginal swab yielded semen that matched a DNA profile belonging to Rowell. (*Id.* at 437–38.) Armed with this information, a detective interviewed Rowell. (*Id.* at 350.) He said he "hadn't had sex since 2009." (*Id.* at 352.) The detective then asked "if he remembered anything about a girl being found passed out behind the Full Moon Saloon." (*Id.*) He said, "[O]h, that's what you're talking about," then claimed that "he was the one who actually got her help" by requesting an "ambulance." (*Id.*) Rowell maintained that he did not have sex with the victim, and that his DNA would not be found in "her vagina." (*Id.* at 353.) Law enforcement subsequently recovered surveillance footage that showed Rowell entering and exiting the alley on the night in question.[2] (*Id.* at 342, 481, 495.)

### B. Procedural History

Rowell was charged with one count of sexual battery on a physically helpless person. (*Id.*, Ex. 1, at 50.) Following a *Faretta*[3] inquiry, he elected to represent himself at trial with the assistance of standby counsel. (*Id.*, Ex. 1a, at 16–33.) After the prosecution gave its opening statement, however, Rowell changed his mind and asked to have standby counsel represent him. (*Id.* at 162.) The court granted the request. (*Id.* at 162–64.)

---

[2] The footage does not depict the rape. (Doc. 6-2, Ex. 1a, at 365.)

[3] *Faretta v. California*, 422 U.S. 806 (1975).

Rowell testified in his defense, offering a story that contradicted what he had told law enforcement. (*Id.* at 462–63.) He claimed that, on the night of the incident, he was drinking malt liquor in the alley behind the Full Moon Saloon. (*Id.* at 464, 467.) Rowell "frequent[ed] this area a lot because at the time [he] was homeless." (*Id.* at 468.) He saw the victim "standing" in "the vicinity" and allegedly "carried on a conversation" with her. (*Id.* at 465–66.) According to Rowell, the victim "became aggressive" and began "rubbing" him, which prompted him to "rub[] back." (*Id.* at 467.) The two then allegedly had "consensual" intercourse. (*Id.*) On direct examination, Rowell admitted that he had 12 prior felony convictions. (*Id.* at 463.)

The jury found Rowell guilty as charged, and the trial court sentenced him to 25 years in prison. (*Id.* at 584, 600.) His conviction was affirmed on direct appeal. (Doc. 6-3, Ex. 5.) Rowell subsequently sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 6-4, Ex. 18, at 1–33, 622–29.) Several of his claims were summarily denied; the remainder were rejected after an evidentiary hearing. (*Id.* at 256–83, 728–35, 872–79, 976–85.) The appellate court affirmed the denial of relief in an unelaborated opinion. (Doc. 6-5, Ex. 26.) Rowell separately filed a petition alleging ineffective assistance of appellate counsel. (Doc. 6-3, Ex. 7.) The appellate court denied relief in an unexplained decision. (*Id.*, Ex. 8.) This federal habeas petition followed. (Doc. 1.)

## II.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody

"in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does

provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by

raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Rowell brings claims for ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v.*

*Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id*. at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id*. at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.    ANALYSIS

### A. Ground One—Sufficiency of the Evidence

Rowell argues that his conviction for sexual battery violates due process because the prosecution failed to establish that the victim (1) "did not give consent to sexual intercourse" and (2) was "physically helpless." (Doc. 1 at 6–8.) Respondent contends that this claim is procedurally defaulted. (Doc. 15 at 6–10.) I need not reach that issue because Rowell's sufficiency challenge fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.*

Rowell fails to meet this "very difficult standard." *In re Boshears*, 110 F.3d 1538, 1541 (11th Cir. 1997). He was charged with sexual battery on a physically helpless person. (Doc. 6-2, Ex. 1.) That offense requires proof that sexual contact "occurred without consent." *Statler v. State*, 349 So. 3d 873, 880 (Fla. 2022). "Consent" means "intelligent, knowing, and voluntary consent and does not include coerced submission." Fla. Stat. § 794.011(1)(a). Moreover, consent "shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender." *Id.* The prosecution also must prove that the victim was "physically helpless"—i.e., that she was "unconscious, asleep, or for any other reason physically unable to communicate unwillingness to an act." *Id.* § 794.011(1)(f). Whether the victim consented and whether she was physically helpless are "factual questions for the jury." *Perez v. State*, 479 So. 2d 266, 267 (Fla. 5th DCA 1985); *see also Hufham v. State*, 400 So. 2d 133, 135 (Fla. 5th DCA 1981) (consent "is essentially a question for the jury").

A rational jury could find beyond a reasonable doubt that the victim did not consent to sexual contact and was physically helpless. The victim was "drunk" by the time she arrived at the nightclub. (Doc. 6-2, Ex. 1a, at 216.) Soon after her arrival, she vomited on the dance floor, fell "[f]ace down in her vomit," and passed out. (*Id.* at 175, 237.) Five or six bouncers picked her up and "carried [her] out to the back alley." (*Id.* at 175, 238.) The next thing she remembered was "a guy asking [her] to open [her] legs." (*Id.* at 176.) She said "no" and tried to "force [her legs] closed." (*Id.* at 177.) At that point, she passed out again. (*Id.* at 200.) When she awoke, she was lying on her back in the alley. (*Id.* at 177, 200.) Rowell left semen

in the victim's vagina, and he ultimately admitted that he had sex with her in the alley. (*Id.* at 437–38, 467.)

Viewed in the light most favorable to the prosecution, this evidence was sufficient to prove that the victim "was so drunk that there was no way she could have given intelligent, knowing, and voluntary consent." *Fogarty v. State*, No. 1D2021-2233, 2024 WL 5151105, at *5 (Fla. 1st DCA Dec. 18, 2024). Even apart from her drunken state, the victim expressly told Rowell "no" and tried to close her legs. (Doc. 6-2, Ex. 1a, at 177.) In these circumstances, a rational jury could easily conclude that the victim did not consent to sexual intercourse. Likewise, the prosecution proved beyond a reasonable doubt that the victim was "unconscious" and "physically unable to communicate unwillingness" during the rape. Fla. Stat. § 794.011(1)(f). True, the victim initially said "no" when Rowell told her to open her legs, but she immediately passed out after that. (Doc. 6-2, Ex. 1a, at 177.) A rational jury could thus conclude that the victim was unconscious when sexual intercourse began. That is sufficient to establish physical helplessness. *See Arroyo v. State*, 252 So. 3d 374, 379 (Fla. 3d DCA 2018) (jury "could infer" physical helplessness from victim's "extreme[] intoxicat[ion]" even though she "initially mumbled 'no' at some point during the initial assault"). Therefore, Rowell's sufficiency challenge fails.

### B. Ground Three—Ineffective Assistance of Trial Counsel

Ground Three alleges ineffective assistance of trial counsel; Ground Two asserts ineffective assistance of appellate counsel. (Doc. 1 at 9–16.) For clarity's sake, I first address the trial-level ineffective-assistance claims. I then turn to the appellate-level claims.

### 1. Sub-Claim A—Failure to Impeach Victim with Prior Inconsistent Statements

Rowell faults trial counsel for failing to impeach the victim with three "prior inconsistent statements." (*Id.* at 12.) First, the victim testified at trial that she did not "drink in the bar" and did not receive the wristband for patrons 21 and older, but she allegedly told law enforcement that she drank "liquor . . . at the club and was . . . marked as 21." (*Id.*) Second, the victim testified at trial that she did not "believe she was assaulted or raped" until she "cleaned herself up at a friend's house," but she allegedly stated during the sexual-assault examination that she "realized what happened to her" as she was "walking to the car" outside the nightclub. (*Id.*) Third, the victim testified at trial that she said "no" when asked to open her legs, but she previously stated that she did not "know whether she said 'No' or 'Yes.'" (*Id.*)

The postconviction court held an evidentiary hearing on this claim. (Doc. 6-4, Ex. 18, at 917.) Trial counsel offered a strategic reason for omitting the victim's prior statements about whether she drank alcohol at the nightclub. (*Id.* at 967.) According to counsel, Rowell "always" maintained "that the victim had consented to engage in sex with him in the alley." (*Id.* at 957.) And, as counsel explained, a person who is "high on alcohol" may be so impaired that she "cannot consent." (*Id.* at 961.) Counsel was thus concerned that highlighting the victim's alcohol consumption would make her seem "so intoxicated she [could not] consent." (*Id.* at 961, 967.) Likewise, any testimony about when the victim realized she had been raped would draw attention to her intoxicated state and potentially undermine the consent defense. (*Id.*) Indeed, the victim's sister testified that she was "slumped

13

over" and "didn't know where she had been" when the police found her. (Doc. 6-2, Ex. 1a, at 223.)

Following the hearing, the postconviction court rejected Rowell's claim in a written order. (Doc. 6-4, Ex. 18, at 980.) It began by deeming counsel's "testimony to be credible based on his demeanor." (*Id.*) The court then found "that it was a reasonable strategy for [counsel] not to highlight the victim's alcohol use." (*Id.*) According to the court, "if counsel had tried to impeach the victim with an alleged prior statement that she drank alcohol inside the club, such an action would have been at odds with [Rowell's] theory that the victim consented to the sexual acts." (*Id.*) "Likewise," the court explained, "if counsel had tried to further question the victim about when she realized she might have been sexually battered, . . . such questioning would have resulted in additional testimony about the victim's level of intoxication immediately after the incident." (*Id.*) Thus, the court held that "counsel did not act deficiently for failing to try to impeach the victim about her alcohol consumption or about why she waited to report the incident as a rape when such questioning could have resulted in additional testimony about the victim's level of intoxication at the time of the incident." (*Id.*)

The court then turned to "counsel's failure to impeach the victim's trial testimony that she told her assailant 'no,' with her prior statement that she was unsure whether she said 'no.'" (*Id.*) The court noted that counsel "brought this information out at trial through another witness." (*Id.*) Specifically, a law enforcement witness "testified on cross-examination that the victim initially reported that 'she doesn't know if she said no or yes.'" (*Id.* at 980–81.) Thus,

14

because "the jury was aware the victim initially was unsure what she told her assailant, . . . the record refute[d] [Rowell's] claim of prejudice." (*Id.* at 981.)

The rejection of this claim was reasonable. First, the postconviction court correctly found no prejudice from counsel's failure to impeach the victim "with her prior statement that she was unsure whether she said 'no.'" (*Id.* at 980.) As the court pointed out, another witness testified that the victim told her she did not "know if she said no or yes." (Doc. 6-2, Ex. 1a, at 358.) Thus, any additional cross-examination on this issue would have been cumulative—that is, it would have merely "amplifie[d] [a] theme[] presented to the jury." *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014). "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).

Second, the postconviction court reasonably concluded that "counsel did not act deficiently for failing to . . . impeach the victim about her alcohol consumption or about why she waited to report the incident as a rape." (Doc. 6-4, Ex. 18, at 980.) "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A strategic choice "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Thus, a

petitioner must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Id.*

Rowell cannot make this showing. At Rowell's insistence, counsel pursued a consent defense. (Doc. 6-4, Ex. 18, at 957.) As counsel correctly explained, a person who is "high on alcohol" may be so impaired that she "cannot consent." (*Id.* at 961.) To avoid undermining the consent defense, counsel strategically refrained from bringing out any testimony that would highlight the victim's intoxication. (*Id.* at 961, 967.) Such testimony included her statements about whether she drank at the nightclub and when she realized that she had been raped. (*Id.*) Given these strategic considerations, a reasonable jurist could conclude that "[some] competent counsel would have taken the action that [Rowell's] counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). Therefore, the ineffective-assistance claim fails.[4]

## 2. Sub-Claim B—Failure to "Invoke Rule of Completeness"

Rowell contends that trial counsel was ineffective for failing to invoke the "rule of completeness" when the prosecution presented surveillance footage from the alley. (Doc. 1 at 12–13.) According to Rowell, the jury did not see "frame number 16," which allegedly showed the victim "walking unobstructed [and] communicating with law enforcement[] immediately after the [] offense occurred."

---

[4] Rowell alleges that, in an "audio recorded interview," the victim "accused one of the bouncer[s] [of being] involved in her alleged assault, not [Rowell]." (Doc. 1 at 12.) But the victim never identified Rowell as the rapist. Indeed, she testified at trial that she could not "identify" Rowell as the perpetrator. (Doc. 6-2, Ex. 1a, at 176, 187.) Thus, counsel had no basis to impeach the victim with her earlier statement. *See Pearce v. State*, 880 So.2d 561, 569 (Fla. 2004) ("To be inconsistent, a prior statement must either directly contradict or be materially different from the . . . testimony at trial.").

(*Id.* at 13.) Had counsel "invoked the rule of completeness," the jury allegedly would have seen this footage and "avoid[ed] any . . . misleading impression." (*Id.*)

The postconviction court rejected this claim as "without merit." (Doc. 6-4, Ex. 18, at 265.) It noted that, contrary to Rowell's assertion, "the jury did see the video clip showing the victim walking out of the alleyway." (*Id.* at 266.) Indeed, on cross-examination of one law enforcement witness, counsel asked, "[T]hose video clips which we've just seen, would you agree with me that none of them show [the victim] until she walks out accompanied by Tampa police officers?" (Doc. 6-2, Ex. 1a, at 360.) The witness answered, "That's correct." (*Id.*) The postconviction court also noted that (1) "during defense counsel's closing arguments, counsel comment[ed], 'Because we then see on the video, we see her walking out of that alley,'" and (2) "the victim testified she walked from the alley to the front of the bar." (Doc. 6-4, Ex. 18, at 267.) Thus, "the jury saw the video clip of the victim walking from the alley and, moreover, was otherwise aware the victim was able to walk out of the alleyway." (*Id.*) This meant that counsel "had no basis to 'invoke the rule of completeness' and . . . the jury was not misled by an incomplete video submission." (*Id.*)

The postconviction court reasonably rejected this claim. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the state court found that counsel was not ineffective because, as a matter of Florida law, counsel "had no basis to 'invoke the rule of completeness.'" (Doc. 6-4, Ex. 18, at 267.) Thus, the state court "already has

told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Rowell] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). I am bound by that determination. *See Wood v. Sec'y Fla. Dep't of Corr.*, No. 5:17-cv-163-MCR-EMT, 2019 WL 3021736, at *25 (N.D. Fla. May 22, 2019) (federal court "must defer to the state court's determination" that "defense counsel did not have a meritorious basis for seeking admission of the entire e-mail based upon the 'rule of completeness'"), *adopted by* 2019 WL 3017770 (N.D. Fla. July 10, 2019).

Because the state court "authoritatively decided as a matter of [Florida] law" that Rowell's proposed objection lacked merit, the remainder of the analysis is straightforward. *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Therefore, the postconviction court reasonably concluded that counsel was not ineffective for declining to raise Rowell's frivolous objection.

### 3. Sub-Claim C—Failure to Request Special Jury Instruction

Rowell faults trial counsel for failing to request a special jury instruction on "knowledge of consent." (Doc. 1 at 13.) The jury received the standard instruction on consent: "'Consent' means intelligent, knowing[,] and voluntary consent and does not include coerced submission. Consent does not mean the failure by the alleged victim to offer physical resistance to the offender." (Doc. 6-2, Ex. 1a, at 565.) According to Rowell, counsel should have requested a special instruction "requiring the prosecutor [to] prove beyond a reasonable doubt [] Rowell's knowledge that his accuser . . . lacked the capacity to consent to sexual conduct."

(Doc. 1 at 13.) Counsel's failure to make this request allegedly deprived Rowell of a "legal defense"—namely, the "lack of evidence to show [he] knew . . . that [the victim] was unable to give [] knowing and voluntary consent." (*Id.*)

The postconviction court found this claim to be "without merit" because Rowell was not entitled to a "special jury instruction." (Doc. 6-4, Ex. 18, at 268–69.) The court explained that, under Florida law, a defendant is not entitled to a special instruction unless "(1) the special instruction [is] supported by the evidence; (2) the standard instruction [does] not adequately cover the theory of defense; and (3) the special instruction [is] a correct statement of the law and not misleading." (*Id.* at 268 (citation omitted).) The court ruled that "the standard jury instruction was adequate to cover [Rowell's] theory of defense." (*Id.* at 269.) Specifically, "the instruction allowed the jury to find [Rowell] not guilty if it believed [his] testimony that the victim was the aggressor in the sexual encounter and that the encounter was consensual." (*Id.*) Likewise, the instruction "allowed the jury to find [Rowell] not guilty if it believed [his] testimony that the victim was upright and speaking and, thus, not 'physically unable to communicate unwillingness to act.'" (*Id.*) As a result, the court held that "counsel did not act deficiently for failing to request a special jury instruction." (*Id.*)

That ruling was reasonable. As noted above, I "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney*, 876 F.3d at 1295. Here, the state court found that Rowell was not entitled to a special jury instruction under Florida law. (Doc. 6-4, Ex. 18, at 268–69.) That determination is binding on federal habeas review. *See Murray v. Sec'y, Dep't of Corr.*, No. 8:19-cv-2943-VMC-SPF, 2022 WL 16573825, at

19

*5 (M.D. Fla. Nov. 1, 2022) (in "reviewing the state court's ruling on [] the *Strickland* claim," federal court "must defer to the state court's" finding that "a request for a special instruction on abandonment would have been rejected as a matter of Florida law"); *Bradley v. Inch*, No. 4:19-cv-89-RH-MJF, 2020 WL 4507442, at *8 (N.D. Fla. June 24, 2020) (federal court "defers to the state court's determination" that "the jury instructions accurately and adequately stated Florida law, and that [petitioner] was not entitled to the 'special instruction' he proposed"), *adopted by* 2020 WL 4501795 (N.D. Fla. Aug. 4, 2020).

Because the state court authoritatively decided that Rowell was not entitled to a special jury instruction, counsel was not deficient for failing to seek one. *See Freeman*, 536 F.3d at 1233 (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

### 4. Sub-Claim D—Failure to Object to Prosecutorial Misconduct

Rowell argues that trial counsel should have objected to several instances of alleged "prosecutorial misconduct in closing argument." (Doc. 1 at 14.) According to Rowell, the prosecution (1) referred to him as a "rapist," (2) "[m]isrepresented" the portion of the surveillance footage that depicts the victim leaving the alley, (3) shifted the burden of proof to him, and (4) "insinuated" that he "tailored his testimony" to the "evidence . . . presented before the jury." (*Id.*) Rowell contends that counsel's failure to object—"and subsequently . . . move for a mistrial"— "severely prejudiced" him. (*Id.*)

The postconviction court correctly concluded that Rowell failed to "establish[] deficient performance or prejudice." (Doc. 6-4, Ex. 18, at 276.) "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must

be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

First, the prosecution's use of the term "rapist" was not improper. As the postconviction court explained, "the prosecutor was making an argument as to the victim's credibility rather than directly calling [Rowell] a rapist." (Doc. 6-4, Ex. 18, at 275.) During closing argument, defense counsel claimed that the victim slept in the Walmart parking lot because she was "getting her story together." (Doc. 6-2, Ex. 1a, at 549.) The prosecution rebutted this argument by asking, "Why in the world would [the victim] make all this up?" (*Id.* at 558.) It explained that the victim (1) "ha[d] to go down to the police station with her parents and tell law enforcement officers [about] bad decisions that she made," (2) had "intimate swabbings taken from the inside of her vagina," and (3) was required "to talk to a detective" and ultimately "tell eight strangers about things that she's probably not proud of." (*Id.* at 558–59.) The prosecution then noted that "when she was coming in here to testify yesterday, last she heard [Rowell] was representing himself; so she was going to be cross-examined by her rapist." (*Id.* at 559.) The prosecution ended by asking a rhetorical question: "Is that what somebody does when they're just making this all up?" (*Id.*)

In context, therefore, the challenged remark was part of an attempt to shore up the victim's credibility. "[A]n attorney is allowed to argue . . . credibility of witnesses or any other relevant issue so long as the argument is based on the

evidence." *Miller v. State*, 926 So. 2d 1243, 1254–55 (Fla. 2006). Moreover, the "rapist" remark came in response to defense counsel's argument that the victim lacked credibility. "If a prosecutor's comments are in direct response to defense counsel's closing argument, the comments are permissible under the invited response doctrine." *Grandison v. State*, 276 So. 3d 43, 46 (Fla. 1st DCA 2019). In any event, the evidence amply supported the conclusion that Rowell raped the victim. A prosecutor's comments are "not improper" where, as here, they are "made in the context of the evidence adduced at trial and refer[] directly to the charges against [the defendant], not to a character trait that was ancillary to or unsupported by the evidence." *Sanchez v. Sec'y, Dep't of Corr.*, 814 F. App'x 520, 522 (11th Cir. 2020) (trial counsel not deficient for failing to object to prosecutor's references to petitioner as an "armed kidnapper," "rapist," "armed robber," and "armed burglar"). Counsel was not deficient for failing to raise Rowell's meritless objection.

Second, the postconviction court reasonably concluded that Rowell was not prejudiced by the prosecution's alleged misrepresentation of the surveillance footage. (Doc. 6-4, Ex. 18, at 275.) The prosecution said that the footage showed the victim "walking out of the alleyway, stumbling, running into the garbage can, clothes falling, hanging off." (Doc. 6-2, Ex. 1a, at 533.) According to Rowell, the footage in fact showed the victim "walking[] unobstructed and communicating." (Doc. 1 at 14.) But, as the postconviction court explained, "the jury had the surveillance video of the victim exiting the alleyway." (Doc. 6-4, Ex. 18, at 275.) Thus, the risk of prejudice from the alleged misstatement was minuscule. *See United States v. Pires*, 642 F.3d 1, 15 (1st Cir. 2011) (noting that the "likelihood of

harm" from prosecutor's misrepresentation of recording "was minuscule" because the recording "was introduced into evidence, and the jury took it into the jury room"). Furthermore, before closing argument, the trial court instructed the jury that "what the attorneys say is not evidence." (Doc. 6-2, Ex. 1a, at 523.) "Because statements and arguments of counsel are not evidence, improper statements can be rectified by the [trial] court's instruction to the jury that only the evidence in the case be considered." *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990). Thus, counsel did not provide ineffective assistance by failing to object.

Third, as the postconviction court explained, counsel "did object to the prosecutor's comments on the basis that the prosecutor was attempting to shift the burden to" Rowell. (Doc. 6-4, Ex. 18, at 276.) The prosecution said, "Only after [Rowell] finds out [about the DNA evidence does] he . . . come on the witness stand and change his story. He was given every opportunity to say that it was consensual sex [during his interrogation] but he didn't." (Doc. 6-2, Ex. 1a, at 562.) Counsel immediately objected on the ground that "the prosecutor is shifting the burden or suggesting that he had to prove his innocence to the police." (*Id.*) The court "overrule[d] the objection," finding that the prosecution was "not there yet." (*Id.*) Because counsel raised Rowell's proposed objection, there is no basis to find deficient performance.[5]

---

[5] Rowell argues that counsel should have also moved for a mistrial based on the allegedly burden-shifting remark. (Doc. 1 at 14.) But in overruling counsel's objection, the trial court expressly found that the comment did not shift the burden of proof. (Doc. 6-2, Ex. 1a, at 562.) Thus, a motion for mistrial premised on that argument would have been futile. Counsel cannot be deemed ineffective for failing to file a futile motion. *See McClarty v. Sec'y, Dep't of Corr.*, No. 15-15669-E, 2016 WL 10703187, at *7 (11th Cir. Sept. 7, 2016) ("[T]rial counsel was not ineffective for failing to move for a mistrial after the trial court overruled counsel's objections. Because the trial court

In any event, the challenged remarks did not shift the burden of proof. During closing arguments, "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). But that is not what happened here. The challenged remarks were "nothing more than the prosecutor's efforts to highlight [Rowell's] prior inconsistent statements, an emphasis that is entirely proper" in closing argument. *United States v. Smith*, 697 F. App'x 944, 956 (11th Cir. 2017). "[Q]uestioning the truthfulness of a witness who has given inconsistent statements does not shift the burden." *Id.* at 957.

Fourth, the postconviction court correctly found nothing improper about the prosecution's remark that Rowell "tried to tailor his testimony to fit the evidence presented." (Doc. 6-4, Ex. 18, at 276.) The challenged remark came during a discussion of Rowell's cross-examination: "When he's trying to answer questions he's stumbling over his answers because he's trying to remember the evidence that's already been introduced by the State of Florida and how he can make his testimony be consistent with that evidence." (Doc. 6-2, Ex. 1a, at 535.) This was a fair comment on Rowell's evasive testimony about "which direction [he was] coming from [in the alley] and how many times [he went] in and out of the alley" — movements that were captured on surveillance footage shown to the jury. (*Id.* at 492–94, 535.) Because the prosecution is permitted to "comment[] on a witness's

---

determined that the evidence was admissible, and that its prejudicial effect did not outweigh the probative value, any motion for a mistrial would have been futile.").

credibility," counsel was not deficient for failing to object to the challenged remark. *United States v. Sosa*, 777 F.3d 1279, 1295 (11th Cir. 2015).

### 5. Sub-Claim E—Failure to Make Opening Statement

Rowell contends that trial counsel provided ineffective assistance by failing "to offer any opening statement." (Doc. 1 at 14.) As explained above, Rowell initially elected to represent himself at trial with the assistance of standby counsel. (Doc. 6-2, Ex. 1a, at 16–33.) After the prosecution gave its opening statement, Rowell said, "Judge, I have no opening statement. We can proceed on after this." (*Id.* at 158.) Outside the presence of the jury, the court sought clarification: "Is [] your intention to make no opening statement or are you reserving your opening statement until the defense case?" (*Id.* at 161.) Rowell responded that he would reserve his opening until "the defense case." (*Id.*) Before any witnesses testified, Rowell changed his mind about proceeding pro se and asked to have standby counsel represent him. (*Id.* at 162.) The court granted the request. (*Id.* at 162–64.)

After the prosecution rested, Rowell indicated that he wished to testify in his defense. (*Id.* at 460.) The court noted that Rowell had previously said he would "reserv[e] [opening argument] until the defense case." (*Id.*) Counsel stated, however, that he did "not wish to make an opening statement." (*Id.*) Rowell proceeded to testify, and counsel ultimately gave a closing argument that spanned 18 transcript pages. (*Id.* at 462–508, 538–55.)

Rowell now contends that counsel should have made an opening statement after the prosecution rested. (Doc. 1 at 14–15.) He says that, "[i]n failing to give an opening, counsel did not offer anything positive to [his] case." (*Id.* at 15.) He also

argues that the "lack of [an] opening statement" deprived the jury of "an outline
of the [d]efense theory of the case." (*Id.*)

The postconviction court rejected this claim, finding neither "deficient
performance" nor "prejudice." (Doc. 6-4, Ex. 18, at 277.) The court held that
counsel did not "act[] deficiently for declining to present an opening statement
after the close of the State's case." (*Id.*) "At that point in trial," the court explained,
Rowell "had decided to testify and, in fact, was called as a witness immediately
after counsel's exchange with the court." (*Id.*) Thus, Rowell "was able to present
his version of events at essentially the same time as counsel would have done if he
opted to give an opening statement." (*Id.*)

The postconviction court reasonably found no prejudice from the failure to
give an opening statement. "The prejudice prong requires the petitioner to
establish a reasonable probability that, but for counsel's errors, the outcome at trial
would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261
(11th Cir. 2014). "Applying AEDPA to *Strickland*'s prejudice standard, [a court]
must decide whether the state court's conclusion that [counsel's] performance . . .
didn't prejudice [the petitioner]—that there was no substantial likelihood of a
different result—was so obviously wrong that its error lies beyond any possibility
for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308,
1317 (11th Cir. 2024).

Rowell cannot meet this demanding standard. As an initial matter, "the
mere fact that counsel did not make an opening statement is not sufficient for a
defendant to prevail on a claim of ineffective assistance." *United States v. Mealy*,
851 F.2d 890, 909 (7th Cir. 1988); *see also Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir.

2002) ("A trial counsel's failure to make an opening statement . . . does not automatically establish the ineffective assistance of counsel."). Moreover, Rowell fails to explain how the lack of an opening statement prejudiced him. As the postconviction court explained, Rowell adequately presented his theory of the case through his trial testimony—specifically, he claimed that he and the victim had "consensual" intercourse in the alley behind the Full Moon Saloon. (Doc. 6-2, Ex. 1a, at 467.) Counsel vigorously pursued this defense in closing, maintaining that Rowell and the victim had a "consensual encounter." (*Id.* at 545.) Because Rowell was able to present his defense through his own testimony and his attorney's closing argument, the postconviction court reasonably found no prejudice from the failure to give an opening statement. *See United States v. Scanes*, No. 1:11-cr-35-MW-GRJ, 2017 WL 6945186, at *6 (N.D. Fla. Oct. 31, 2017) (no prejudice from "decision to forego an opening statement" because counsel "provided a robust closing argument" and defendant was able to present his defense "through defense testimony"), *adopted by* 2018 WL 406128 (N.D. Fla. Jan. 12, 2018).

## 6. Sub-Claim F—Failure to Object to Allegedly Vindictive Sentencing

Rowell faults trial counsel for failing to argue that the sentence of 25 years' imprisonment was "vindictive." (Doc. 1 at 15.) He alleges that the trial court imposed this sentence because he rejected plea offers and "exercis[ed] his right[] to a jury trial." (*Id.*) He also claims that the court "urged [him] to accept a plea" and "conducted 'off-the-record'" plea negotiations both before and after the "jury was selected." (*Id.*)

The postconviction court found this claim "to be without merit." (Doc. 6-4, Ex. 18, at 278.) It explained that, over a year before trial, "the State offered [Rowell]

a sentence of 20 years' prison followed by 10 years' sex offender probation by way of a plea letter." (*Id.*) During a "pretrial conference," Rowell "acknowledged receiving the offer letter and indicated [that] he rejected it." (*Id.*) As the postconviction court noted, Rowell "asked the [trial] court if he could submit a counteroffer to the State, to which the court responded that [he] was more than welcome to take such action." (*Id.* at 279.) When Rowell asked if the prosecution would "cap[] [the sentence at] the lowest permissible guidelines range," the trial court responded, "That will be between you and the State. I won't get involved in any negotiations." (Doc. 6-2, Ex. 1a, at 643–44.)

The postconviction court noted that the issue of plea negotiations came up again "[p]rior to the start of voir dire." (Doc. 6-4, Ex. 18, at 279.) Specifically, the trial court asked the parties if they "want[ed] a few more moments to discuss the possibility of resolution." (Doc. 6-2, Ex. 1a, at 10–11.) The court made clear that it would not be involved in negotiations: "[L]et me explain something, I'm not a mediator so I'm not going to sit here and say, oh, what are you offering and what are you offering and try to meet—I don't do that." (*Id.* at 11.) Rowell said he wished to discuss the matter with standby counsel. (*Id.*) After a break, counsel stated that the prosecution had made a "tentative[]" offer of "nine years Florida State Prison," and that he had "urged" Rowell to accept the deal. (*Id.* at 13–14.) The court told Rowell that it would not "push[]" him or serve as "a mediator"; "all [it would do] is offer you all the time" to have "further discussions." (*Id.* at 15.) The court again offered the parties "another moment" to discuss the matter, but Rowell said, "Judge, let's go ahead and do the trial." (*Id.* at 16.)

28

The postconviction court next discussed the sentencing. (Doc. 6-4, Ex. 18, at 280.) During sentencing, the prosecution clarified that it had never "officially offered the nine years." (Doc. 6-2, Ex. 1a, at 591.) Instead, the prosecution had told defense counsel that it "would go and speak to the victim before officially" making the offer. (*Id.* at 591.) The court interjected: "[T]hat method of essentially saying we'll take this, going through a negotiating process, and then saying now we'll check and see if we're really going to take this . . . doesn't ring well. So that's not a good way to handle things." (*Id.* at 592.) "That said," the court remarked, "we're not in plea negotiations[;] that matter did not resolve." (*Id.*) The court ultimately justified its 25-year sentence by pointing to Rowell's "prior [criminal] record," the "disturbing facts" of the case, Rowell's "age," and the "protection of the public." (*Id.* at 599–600.)

Based on these "portions" of the transcript, the postconviction court held that the record "refute[d] [Rowell's] claim that counsel acted deficiently for failing to object to a vindictive sentence." (Doc. 6-4, Ex. 18, at 280.) Specifically, the trial court did not "start[] or participate[] in the plea negotiations," and it expressly informed Rowell that it "would not get involved in negotiations" or "act as a mediator." (*Id.*) Moreover, as the postconviction court noted, "the offers were not coming from [the trial court], but as reflected in both the State's and [defense counsel's] comments prior to voir dire and during sentencing, were coming from the State." (*Id.*) Lastly, the trial court "did not 'urge' [Rowell] to accept an offer, but instead offered [him] additional time to work out a negotiation." (*Id.*) Thus, the postconviction court held that Rowell had not "established counsel acted deficiently for failing to object to a vindictive sentence." (*Id.*)

The rejection of this claim was reasonable. As the postconviction court explained, counsel had no basis to argue that the 25-year sentence was vindictive. "[A] defendant cannot be punished simply for exercising his constitutional right to stand trial." *Frank v. Blackburn*, 646 F.2d 873, 882–83 (5th Cir. 1980). But "the mere imposition of a longer sentence than defendant would have received had he pleaded guilty [does not] automatically constitute[] such punishment." *Id.* at 883. Instead, the defendant must show a "reasonable likelihood" that "the increase in sentence is the product of actual vindictiveness"—that is, a desire to punish the defendant for exercising a legal right. *Alabama v. Smith*, 490 U.S. 794, 799 (1989).

Rowell makes no such showing. Nothing in the record suggests that the trial court sought to punish Rowell for exercising his right to stand trial. Nor is there any evidence that the court "urged [Rowell] to accept a plea" or "conducted 'off-the-record'" plea negotiations. (Doc. 1 at 15.) The court imposed a 25-year sentence, not to punish Rowell for going to trial, but rather because it believed such a sentence to be appropriate in the light of his "prior [criminal] record," the "disturbing facts" of the case, his "age," and the need to "protect[] . . . the public." (Doc. 6-2, Ex. 1a, at 599–600.) In short, Rowell "offer[s] no evidence of vindictive sentencing beyond his allegations that the sentences imposed by the trial court were more than the sentences offered by the State." *Horsley v. Sec'y, Dep't of Corr.*, No. 8:14-cv-930-CEH-AAS, 2017 WL 320919, at *7 (M.D. Fla. Jan. 23, 2017). That is insufficient to establish "a claim of constitutionally impermissible vindictive sentencing." *Id*. Thus, the postconviction court reasonably concluded that counsel was not deficient for failing to raise Rowell's meritless objection.

### C. Ground Two—Ineffective Assistance of Appellate Counsel

Rowell contends that appellate counsel was deficient in several respects. (Doc. 1 at 9.) "A defendant can establish ineffective assistance of appellate counsel by showing: (1) appellate counsel's performance was deficient, and (2) but for counsel's deficient performance he would have prevailed on appeal." *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1310 (11th Cir. 2008). The state court rejected Rowell's ineffective-assistance-of-appellate-counsel claims in an unexplained decision. (Doc. 6-3, Ex. 8.) "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Rowell cannot meet his burden.

### 1. Sub-Claim A—Failure to Argue That Victim Was Not Physically Helpless

According to Rowell, appellate counsel should have argued that the prosecution failed to establish that the victim was "physically helpless to resist." (Doc. 1 at 9.) As explained in the discussion of Ground One, a rational jury could find beyond a reasonable doubt that the victim was "physically helpless" as defined by the sexual-battery statute. Thus, "appellate counsel was not ineffective for failing to raise [this] nonmeritorious issue." *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001).

### 2. Sub-Claim B—Failure to Raise Prosecutorial Misconduct

Rowell faults appellate counsel for failing to raise several instances of alleged "prosecutorial misconduct" during closing argument. (Doc. 1 at 10.) I already addressed several of the challenged remarks in connection with Ground Three, Sub-Claim D. There, Rowell argued that trial counsel was deficient for not

objecting when the prosecution (1) referred to him as a "rapist," (2) "[m]isrepresented" a portion of the surveillance footage, (3) shifted the burden of proof, and (4) "insinuated" that he "tailored his testimony" to the "evidence . . . presented before the jury." (*Id.* at 14.) I explained above why a reasonable jurist could conclude that these remarks were either proper or not prejudicial, and that therefore trial counsel was not deficient for failing to object to them. The same reasoning applies to appellate counsel's failure to challenge the remarks on direct appeal. *See Rager v. Inch*, No. 3:19-cv-740-LC-HTC, 2021 WL 968958, at *10 (N.D. Fla. Jan. 25, 2021) ("[T]rial counsel was not ineffective for raising this claim and, thus, appellate counsel could not have been ineffective for failing to raise this claim."), *adopted by* 2021 WL 964039 (N.D. Fla. Mar. 15, 2021). Thus, appellate counsel was not deficient for failing to raise these meritless objections.

Rowell points to two other prosecutorial remarks that he believes appellate counsel should have challenged on direct appeal. Rowell's objections to these remarks are meritless; thus, appellate counsel was not ineffective for failing to raise them. First, Rowell argues that the prosecution vouched for the victim's "credibility" and "[r]esorted to" a "golden rule" argument in closing. (Doc. 1 at 10.) The prosecution sought to persuade the jury that the victim was credible by asking the following question: "Having her parents sit in the back of this courtroom during the trial and her having to tell you what happened to her, don't you think if she was making it up she would have stopped this terrible process a long time ago?" (Doc. 6-2, Ex. 1a, at 559.) The "terrible process" included not only the trial itself but also the investigation, which entailed "talk[ing] to a detective" and "hav[ing] intimate swabbings taken from the inside of her vagina." (*Id.*)

A reasonable jurist could conclude that these remarks did not constitute improper bolstering. "A prosecutor's remarks are improper if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "To determine if the government improperly vouched for a witness, the court must decide whether a jury could reasonably believe that the prosecutor was indicating a personal belief in the witness'[s] credibility." *Id.* "This prohibition against vouching does not, however, forbid prosecutors from arguing credibility; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *Id.*

The challenged remarks did not "amount to an explicit, personal guarantee of credibility, such as assuring the jury that the prosecution would not have brought the case unless the defendant was actually guilty." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). Instead, the remarks invited the jury to find the victim credible "based on her behavior on the stand and the evidence admitted." *United States v. Hope*, 608 F. App'x 831, 841 (11th Cir. 2015). As explained above, "an attorney is allowed to argue . . . credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller*, 926 So. 2d at 1254–55.

Nor did the challenged remarks constitute an improper "golden rule" argument. A prosecutor makes an improper golden rule argument by "invit[ing] the jurors to place themselves in the victim's position *during the crime* and imagine the victim's suffering." *Braddy v. State*, 111 So. 3d 810, 842 (Fla. 2012) (emphasis added). Here, the prosecution did not ask the jurors to place themselves in the

victim's position during the rape. Instead, the challenged remarks "concerned the difficulty the [] victim went through in testifying at trial and the courage it took to disclose what had happened to her." *Hernandez v. Sec'y, Dep't of Corr.*, No. 22-13866, 2024 WL 1554359, at *5 (11th Cir. Apr. 10, 2024). Thus, the remarks "were not golden rule arguments and were not improper nor legally objectionable." *Id.*

Second, Rowell argues that the prosecution improperly "[c]ommented on [his] detention and prior convictions." (Doc. 1 at 10.) The prosecution referred to his prior felony convictions in closing argument, urging the jury to "consider" his status as a "12-time convicted felon" when "weighing [his] credibility." (Doc. 6-2, Ex. 1a, at 535; *see also* Doc. 6-2, Ex. 1a, at 559–60.) But there was nothing improper about that. "The fact that [Rowell] was a convicted felon was a matter that the jury could consider in evaluating [his] testimony to determine whether [he] was credible and reliable." *Jones v. State*, 666 So. 2d 995, 997 (Fla. 5th DCA 1996); *see also Campbell v. Greer*, 831 F.2d 700, 707 (7th Cir. 1987) (noting "the common-sense proposition that a person who has flouted society's most fundamental norms, as embodied in its felony statutes, is less likely than other members of society to be deterred from lying under oath in a trial by the solemnity of the oath, the . . . danger of prosecution for perjury, or internalized ethical norms against lying").

The reference to Rowell's "detention" came during his cross-examination. Following the DNA match, law enforcement located Rowell on a street corner in Ybor City. (Doc. 6-2, Ex. 1a, at 324–25.) He was initially taken into custody for an unrelated, "out of state" arrest warrant. (*Id.* at 497.) That matter was dropped when it emerged that Rowell would not be "extradite[d]" "for th[e] warrant," which arose from a "traffic ticket." (*Id.* at 497–98.)

Even assuming this testimony was improper, appellate counsel could reasonably have refrained from raising the issue because Rowell suffered no prejudice. Prosecutorial misconduct does not warrant relief unless the challenged remarks "prejudicially affect[ed] the substantial rights of the defendant." *Eyster*, 948 F.2d at 1206. That, in turn, requires "a reasonable probability" that, "but for the remarks, the outcome of the trial would have been different." *Id.* Rowell cannot make this showing. There is no likelihood that the jury was swayed by the revelation that Rowell had been arrested on an out-of-state warrant involving a traffic ticket. Moreover, the testimony "was isolated and was not made a feature of the trial." *Littler v. Sec'y, Dep't of Corr.*, No. 8:15-cv-1447-CEH-TBM, 2018 WL 3105250, at *5 (M.D. Fla. June 25, 2018) (finding no prejudice from counsel's "failure to request a curative instruction" concerning "improper" reference to petitioner's "arrest[]"). And, as explained above, the prosecution presented "sufficient independent evidence of guilt," making "any [potential] error . . . harmless." *Eyster*, 948 F.2d at 1206.

### 3. Sub-Claim C—Failure to Argue "Judicial Vindictiveness"

Rowell faults appellate counsel for failing to argue that his 25-year prison sentence was "the product of judicial vindictiveness." (Doc. 1 at 10.) As I explained above in connection with Ground Three, Sub-Claim F, trial counsel had no basis to argue that the sentence was vindictive. The same reasoning dooms Rowell's claim of appellate-level ineffective assistance. *See Chandler*, 240 F.3d at 917 (noting that "appellate counsel was not ineffective for failing to raise a nonmeritorious issue").

### 4. Sub-Claim D—Failure to Raise *Faretta* Error

Rowell contends that appellate counsel provided ineffective assistance by failing to challenge the "denial of [his] request for self-representation." (Doc. 1 at 10.) The alleged *Faretta* error took place immediately after Rowell had been sentenced. At that point, Rowell was represented by counsel. The trial court informed Rowell that he had "the right to appeal" and that a lawyer could "be appointed for him" if he could not "afford" one. (Doc. 6-2, Ex. 1a, at 606–07.) Counsel then asked the court to "sign" an "order appointing the public defender for the purpose of appeal." (*Id.* at 607.) The court agreed to sign the order, whereupon Rowell said, "I will be filing my own—all post-conviction motions, please." (*Id.*) The court responded that it was "inclined to sign this and then you can meet with that person and certainly if you wish to decline that service at least it will be an opportunity for you to meet someone as you begin the process." (*Id.*) Rowell again said that he "would like to file all my post-conviction motions as pro se." (*Id.*) The court ultimately "sign[ed] th[e] order" "in an abundance of caution and certainly recognizing that you can decline any and all services." (*Id.*) Rowell was represented by the public defender's office on direct appeal, but he did file a pro se motion for "arrest of judgment." (*Id.*, Ex. 1, at 506; Doc. 6-3, Ex. 2.) That motion was dismissed for lack of jurisdiction because Rowell's appeal remained pending. (Doc. 16-2, Ex. 32.)

According to Rowell, the court violated his Sixth Amendment right to self-representation by denying his post-sentencing request to "proceed pro se" without holding a *Faretta* hearing. (Doc. 6-3, Ex. 7, at 13.) Rowell argues that appellate counsel "was ineffective for not raising this constitutional issue" on direct appeal. (Doc. 1 at 10.)

Rowell's *Faretta* claim is meritless, so appellate counsel was not deficient for failing to pursue it. "The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004). A defendant also "has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." *Faretta*, 422 U.S. at 807. But "a defendant's federal constitutional right to self-representation ends when he . . . has been convicted." *Lambrix v. State*, 124 So. 3d 890, 899 (Fla. 2013). In other words, a defendant has no "constitutional right to self-representation on direct appeal from a criminal conviction" or during postconviction proceedings. *Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 163 (2000); *see also United States v. Tollefson*, 853 F.3d 481, 484–85 (8th Cir. 2017) (*Faretta* does not apply to "postconviction . . . proceedings"); *Rose v. Crosby*, No. 8:93-cv-1169-SDM-EAJ, 2006 WL 4701821, at *3 (M.D. Fla. Apr. 26, 2006) ("[T]he Sixth Amendment right to self-representation vanishes following a guilty verdict.").

Rowell complains that he was denied his constitutional right to self-representation *after* he was convicted and sentenced. (Doc. 6-3, Ex. 7, at 13.) Because no such right exists, appellate counsel did not provide ineffective assistance by failing to raise the *Faretta* issue.

### 5. Sub-Claim E—Failure to Challenge Absence of Special Instruction

Rowell faults appellate counsel for failing to argue that he was "denied" a "legal defense" because the trial court did not provide a special "mens rea jury instruction." (Doc. 1 at 9.) The proposed instruction would have required the jury to find that Rowell was aware of the victim's "incapacity" to consent. (Doc. 6-3, Ex. 7, at 15.) Rowell raised a similar claim in Ground Three, Sub-Claim C, arguing

that trial counsel should have requested the proposed instruction. (Doc. 1 at 13.) As explained above, the postconviction court held that Rowell was not entitled to a special "mens rea" instruction under Florida law, and that therefore trial counsel was not deficient for failing to request one. (Doc. 6-4, Ex. 18, at 268–69.) The state court could reasonably have rejected Rowell's claim of *appellate-level* ineffective assistance for the same reason—i.e., that "the standard jury instruction was adequate to cover [his] theory of defense," and that therefore appellate counsel had no basis to raise the issue on direct appeal. (*Id.* at 269.) Thus, Rowell is not entitled to relief on his claim of ineffective assistance of appellate counsel.

### 6. Sub-Claim F—Failure to Challenge Denial of Pretrial Motions

According to Rowell, appellate counsel should have argued that the trial court "abused [its] discretion" by denying unspecified "pretrial motions." (Doc. 1 at 9.) Rowell offers no additional support for this claim. He does not identify the "pretrial motions" that were wrongly denied, nor does he offer any basis to conclude that the failure to appeal their denial constituted deficient performance or caused him prejudice. (*Id.*) As a result, this claim is too conclusory to warrant relief. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) (finding habeas petition "insufficient" because petitioner had "not alleged any facts to support his allegations" of ineffective assistance); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[A] district court cannot be expected to do a [habeas] petitioner's work for him.").

Even apart from this pleading defect, Rowell cannot show that the state court acted unreasonably in rejecting his ineffective-assistance claim. In his state habeas petition, Rowell faulted appellate counsel for failing to challenge the denial

of several pretrial motions. (Doc. 6-3, Ex. 7, at 18–19.) He listed seven motions, including a motion in limine, a motion to dismiss the indictment, a motion to set bond, a motion to strike the prosecution's motion to compel a saliva sample, and a motion to terminate standby counsel. (*Id.*) But Rowell failed to explain how the trial court erred in denying any of these motions. (*Id.*) And he made no attempt to show that "he would have prevailed on appeal" had counsel raised the issues in question. *Shere*, 537 F.3d at 1310. Instead, he baldly asserted that the trial court "abuse[d] [its] discretion" and violated his constitutional rights. (Doc. 6-3, Ex. 7, at 18–19.) Such "[c]onclusory allegations of ineffective assistance are insufficient." *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992). Thus, Rowell cannot show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see also Wilson v. Sec'y, Fla. Dep't of Corr.*, 769 F. App'x 825, 827 (11th Cir. 2019) ("[I]neffective assistance of counsel cannot be proven via conclusory assertion[,] but that is all [petitioner] offered [the state court]. The federal district court was therefore correct in upholding the state court's determination.").

### 7. Sub-Claim G—Failure to Challenge Lack of "Competency Evaluation"

Rowell faults appellate counsel for not arguing that the trial court "fail[ed] to have a competency evaluation where [his] mental health came into question." (Doc. 1 at 9.) The record refutes this claim. Two years before trial, the court ordered a competency evaluation of Rowell. (Doc. 6-2, Ex. 1, at 55–58, 92–95.) He underwent multiple psychiatric evaluations, after which the court found him competent to stand trial. (*Id.* at 280–94; Doc. 6-2, Ex. 1a, at 36.) Thus, there is no factual basis for Rowell's claim that the court failed to order a competency

evaluation. Appellate counsel was not deficient for failing to raise this baseless argument.

### D. Cumulative Error

Finally, Rowell says appellate counsel should have argued that the "cumulative effect of the trial court's errors denied [him] a fair and impartial trial." (Doc. 1 at 9.) Likewise, he contends that the "[c]umulative effect of trial counsel['s] errors violated" his "constitutional right to a fair trial." (*Id.* at 16.)

"Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Here, each individual claim of error lacks merit. Thus, Rowell's cumulative-error claim necessarily fails, and appellate counsel had no basis to argue for reversal based on cumulative error.

### V.    CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Rowell must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Rowell has not made the requisite

showing. Finally, because Rowell is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Rowell's Petition for Writ of Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter judgment against Rowell and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on February 10, 2025.

Kathryn Kimball Mizelle
United States District Judge